UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW SCOTT GROVER,<br><br>Defendant. | Case No. 1:16-cr-00282-BLW<br><br>MEMORANDUM EXPLAINING POLICY DISAGREEMENT WITH METHAMPHETAMINE SENTENCING GUIDELINES |

**INTRODUCTION**

The United States Sentencing Guidelines were designed to promote the twin goals of uniformity and proportionality in sentencing. The task was not easy to achieve, and efforts have continued to identify and eliminate sources of unwarranted disparities in federal sentencing. I write here to join several colleagues in expressing my belief that the methamphetamine Guidelines contain one such unwarranted disparity.[1] Due to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise, and the presumptive

---

[1] Judge Bataillon of the District of Nebraska has written thoughtfully and extensively of the flaws in the methamphetamine Guidelines. *See, e.g.*, *United States v. Goodman*, 556 F.Supp.2d 1002, 1016 (D. Neb. 2008); *United States v. Hubel*, 625 F.Supp.2d 845, 853 (2008). Judge Bennett of the Northern District of Iowa also undertook a careful review of the history of the methamphetamine Guidelines, the Sentencing Commission's non-empirical approach to their development, and their failure to reach uniform and proportional sentences. *See U.S. v. Hayes*, 948 F.Supp.2d 1009 (2013).

purity assigned to untested drugs does not reflect market realities. Moreover, whether a substance was lab tested for purity can have an arbitrary and unwarranted effect on the sentence imposed. The result is a scheme that undermines the sentencing goals laid out in 18 U.S.C § 3553(a).

The purpose of this memorandum is to provide a reasoned explanation for my policy disagreement with the Guidelines and to lay out my methodology for sentencing in methamphetamine cases.

## LEGAL STANDARD

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are just "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 105 (2007). While the Guidelines must serve as the "starting point and the initial benchmark" of this inquiry, the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The court's central task must be to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

District courts may vary from the Guidelines on policy grounds. The Supreme Court expressly recognized this authority in *Kimbrough*, where it held that "district courts are free to deviate from the Guidelines based on disagreements with the crack/powder ratio." 552 U.S. at 106–07. The Court went on to state in *Spears v. United States*, 555 U.S. 261 (2009) (per curiam), that a guideline may be rejected on a categorical basis "and

not simply based on an individualized determination that [it] yield[s] an excessive sentence in a particular case." *Id.* at 264. The Ninth Circuit has since held that *Kimbrough* and *Spears* permit sentencing judges to "reject *any* Sentencing Guideline [based on a policy disagreement], provided that the sentence imposed is reasonable." *United States v. Mitchell*, 624 F.3d 023, 1030 (9th Cir. 2010) (emphasis added).

In *Kimbrough*, the Court explained that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the heartland' to which the Commission intends individual Guidelines to apply." *Kimbrough*, 552 U.S. at 89 (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). This is especially true where the Guidelines provisions "do not exemplify the Commission's exercise of its characteristic institutional role[,]" which is "to base its determinations on empirical data and national experience." *Id.* at 109.

## DISCUSSION

Base Offense Levels for federal drug crimes are calculated using the Drug Quantity Table found in § 2D1.1(c) of the Sentencing Guidelines, which uses a graduated scale based on the type and quantity of drugs involved. Methamphetamine, unlike most controlled substances, is to be quantified based on purity, using either the weight of a mixture containing the drug or the weight of the pure drug itself contained within the mixture, whichever yields the greater offense level. *See* U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (B).

In determining the Base Offense Level, there is a 10:1 ratio between pure or "actual" methamphetamine and an equivalent weight of methamphetamine mixture. For example, 15 grams of pure methamphetamine is treated the same as 150 grams of methamphetamine mixture. The 10:1 ratio was first introduced in the 1989 Sentencing Guidelines. I have tried to determine whether there is any empirical data from the Sentencing Commission or in the academic literature which would justify the ratio. I have found none. Rather, these distinctions seem to be tiered to a similar 10:1 ratio used in the mandatory minimum sentences imposed by Congress. *See* 21 U.S.C. § 841(b)(1)(A)(viii) & § 841(b)(1)(B)(viii).[2] That determination was, by its very nature, a product of political calculation and compromise rather than empirical analysis.

The practical effect of the ratio is to impose a presumed purity of 10% for untested methamphetamine mixtures. The ratio may therefore have been based on the assumption that most methamphetamine was produced in a home lab where purity levels of approximately 10% were typical, or where purer methamphetamine was "stepped on" by diluting it with other inert substances to increase profitability. From my experience,

---

[2] Congress first introduced the methamphetamine purity distinction in the 1988 Anti-Drug Abuse Act, in which the weight quantity of methamphetamine mixture triggering each mandatory minimum was set at ten times the quantity of the pure methamphetamine triggering that same statutory minimum penalty. The Commission responded by amending the Guidelines to reflect the 10-to-1 mixture/pure substance ratio. *See* United States Sentencing Commission, *Methamphetamine: Final Report*, at 7 (Nov. 1999), http://www.ussc.gov/sites/default/files/ pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf.
(Continued)

purity levels of seized drugs in the 10% range were common until approximately 20 years ago. Realities on the ground have since changed.

Today, methamphetamine is almost always imported from foreign drug labs and the purity levels are much higher. A recent 2015–16 survey of drug purity levels in the District of Idaho revealed an average purity level of 92.6% with a low of 88% and a high of 100%.[3] A 1999 report of the U.S. Sentencing Commission indicates that average nationwide purity rates had already jumped to 50% at the turn of the century. *See* United States Sentencing Commission, *Methamphetamine: Final Report*, at 7 (Nov. 1999), http://www.ussc.gov/sites/default/files/ pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf; *see also United States v. Ortega*, No. 8:09CR400, 2010 WL 1994870, at *1 (D. Neb. May 17, 2010) ("The government acknowledged at the sentencing hearing that the purity of most methamphetamine on the street now is 40%–50%[.]").

Simply put, the presumed purity of 10% for untested methamphetamine is no longer valid. This, in turn, has led to substantial and unwarranted disparities in sentencing based solely on whether methamphetamine is lab tested. In many cases, the

---

[3] The unpublished survey included all defendants sentenced in the District of Idaho between October 1, 2015 and September 30, 2016 for Title 21 offenses involving methamphetamine. In each case, the presentence report was reviewed to determine the weight of the methamphetamine mixture and the lab purity results, if provided. The mean purity for all forensically tested methamphetamine was 92.59%. In cases where no test was performed, the defendant's base offense level was recalculated to determine what impact testing might have made. Using a presumed 92.59% purity rate, the average difference in the base offense level was 5.65 levels.

Guidelines range where testing has been performed is double that where a drug's purity is unknown. Take, for example, a case involving a methamphetamine mixture of 150 grams and 90% purity. Had purity testing been performed, the base offense level would be 30, while the base offense level for untested methamphetamine would be 24. Assuming no adjustments and a Criminal History Category of I, the Guidelines range without purity testing is 51–63 months. With purity testing, the Guidelines range balloons to 97–121 months—an increase in the Guidelines range of over 90% attributable to the fact of testing alone.

The reasons why testing is or is not performed in any case are completely arbitrary. In many cases, only some of the drugs were seized and available for testing. In others, the testing lab was too busy to complete testing before sentencing. In some, the wise defendant pled guilty early in the case so that sentencing would occur before testing could be completed. In many cases, the prosecution originated with a state agency where testing could not be completed in a timely manner. Regardless, none of these reasons relate to the defendant's culpability or the danger which he or she poses to society.

Increases in methamphetamine purity also undermine its function as a proxy for culpability, especially for low-level offenders. The Sentencing Commission considers drug purity relevant in part because "possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."

U.S.S.G. § 2D1.1 cmt. 9.[4] Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution. The importance assigned to purity is even less justified for a low-level offender who has no knowledge or control of the purity level. *See, e.g.*, *U.S. v. Hayes*, 948 F.Supp.2d 1009 (2013) (observing that problems with outdated purity assumptions are "heightened when the offender was merely a courier or mule who has no knowledge of the purity of the methamphetamine he or she is transporting"); *United States v. Ortega*, 2010 WL 1994870 (D. Neb. May 17, 2010) (recognizing that purity-based penalties "illogically skew[] sentences for 'average' defendants to the upper end of the sentencing spectrum, blurring the distinctions between high and low level distributors in a hierarchy").

For these reasons, I am left with a very imperfect scenario and a situation which the Guidelines was intended to avoid—arbitrary and irrational distinctions between sentences imposed upon similarly situated defendants. On the one hand, it is clear that the 10:1 ratio is not empirically justified, and the arbitrariness of lab testing only compounds the issue. Purity is also a less meaningful proxy for culpability where nearly all methamphetamine sold is of 90 percent purity or greater. On the other hand, logic would suggest that individuals who deal in purer forms of any drug are sometimes more

---

[4] Although U.S.S.G. § 2D1.1 comment 9 does not apply directly to methamphetamine, the purity-based methamphetamine penalties evidences this same assumption. *Accord United States v. Kort,* 440 Fed.Appx. 678, 685 (10th Cir.2011).

culpable and pose a greater danger to society. Thus, I am not willing to completely disregard the drug purity testing, when it has been performed. I would further note that if I ignore the enhancement completely, this may well cause the U.S. Attorney to file cases in such a way as to increase the likelihood that mandatory minimums will apply. That, in turn, may prove detrimental to other criminal defendants.

In this decidedly imperfect world, I am going to exercise my discretion to consider the drug quantity and purity issue as only loosely advisory. My approach to determining the appropriate sentence will be as follows. I will begin, as always, by determining the advisory Guidelines range and determining if the Guidelines permit a traditional departure. Then, I will consider the factors set out in § 3553(a) to determine whether the circumstances justify a variance from the Guidelines.

Among the § 3553(a) factors most relevant here are "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and "the need for the sentence imposed . . . to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(2), (6). For the reasons stated above, I believe that the methamphetamine Guidelines produce advisory sentences that fail to achieve these § 3553(a) objectives. I will therefore routinely consider granting a variance in cases where drug purity testing has been completed, so as to ameliorate the unwarranted disparity between cases involving tested and untested substances, and to impose a sentence that reflects the seriousness of the offense. The process will involve calculating both guideline ranges and then determining, based upon all of the

circumstances, what constitutes a reasonable sentence under the facts of the case. Typically, this will result in a sentence much closer to the guideline range applicable if no testing had been completed. But, not always. There may be reasons why an individual defendant deserves a higher sentence, unrelated to drug purity. But that determination will be made, in every case, based upon an individualized assessment of all the facts presented, without undue regard for the increased guideline range generated when drug purity is considered.

DATED: June 28, 2017

_____
B. Lynn Winmill
Chief Judge
United States District Court